**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Nov 05 2012, 8:44 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**AMY KAROZOS**
Greenwood, Indiana

ATTORNEYS FOR APPELLEES:

**PATRICK M. RHODES**
Indiana Dept of Child Services
Indianapolis, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION OF )
THE PARENT-CHILD RELATIONSHIP OF: )
R.P., Minor Child, )
)
B.H., Mother, )
)
    Appellant-Respondent, )
)
        vs. )   No. 49A02-1202-JT-84
)
INDIANA DEPARTMENT OF CHILD )
SEVICES, )
)
        and )
)
CHILD ADVOCATES INC., )
)
    Appellees-Petitioners. )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Marilyn A. Moores, Judge
The Honorable Danielle Gaughan, Magistrate
Cause No. 49D09-1107-JT-26268

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

B.H. ("Mother") appeals the involuntary termination of her parental rights to her child, R.P. Concluding that there is sufficient evidence to support the juvenile court's judgment, we affirm.

**Facts and Procedural History**

Mother is the biological mother of R.P., born in April 2010.[1] The evidence most favorable to the juvenile court's judgment reveals that R.P. was born testing positive for methadone. At the time, R.P.'s older siblings, W.H. and Br.H., had each been adjudicated a child in need of services ("CHINS") and had been removed from Mother's care for nearly one year due to Mother's struggle with substance abuse and inability to properly care for the children.[2] Several days after R.P. was born, the local Marion County office of the Indiana Department of Child Services ("MCDCS") filed a petition alleging R.P. was also a CHINS while the child remained in neonatal intensive care at the hospital.[3]

---

[1] At the time of R.P.'s birth, Mother and R.P.'s biological father, R.P., Sr. ("Father") had been living together and involved in a relationship for several years. Father's parental rights were also involuntarily terminated by the juvenile court's January 2012 judgment. Father does not participate in this appeal. We therefore limit our recitation of the facts to those facts pertinent solely to Mother's appeal.

[2] Mother's parental rights to W.H. and Br.H. were later terminated during the pendency of the underlying case pertaining to R.P. after Mother failed to successfully complete reunification services and signed voluntary consents for adoption in July 2011.

[3] R.P. remained in neonatal intensive care for approximately three months before being discharged from the hospital and placed with the current foster family.

During a hearing in August 2010, Mother admitted that R.P. was a CHINS and the child was so adjudicated. A dispositional decree was subsequently issued in October 2010 formally removing R.P. from Mother's custody and making the child a ward of MCDCS. In addition, the juvenile court's dispositional order directed Mother to successfully complete a variety of tasks and services similar to the reunification services previously ordered in R.P.'s siblings' cases and likewise designed to address Mother's parenting deficiencies and substance abuse issues. Specifically, Mother was ordered to, among other things: (1) participate in a drug and alcohol assessment and follow any resulting recommendations; (2) submit to random drug screens; (3) secure and maintain a stable source of income and suitable housing; (4) complete a parenting assessment and follow all resulting recommendations; and (5) successfully complete home-based counseling.

Mother's participation in court-ordered reunification services was sporadic from the beginning and ultimately unsuccessful. Mother continued to abuse the prescription drug Vicodin. Mother also tested positive for marijuana, amphetamines, and cocaine during the initial months of the CHINS case. Although Mother began participating in a methadone treatment program for her Vicodin addiction in March 2010, she failed to successfully complete the program. Moreover, Mother was still receiving methadone treatment at the time of the termination hearing over a year-and-a-half later, even though the program was designed to be completed in nine to ten months. Mother also continued to be involved in an on-again off-again romantic relationship with Father, despite the fact Father had disengaged from reunification services and continued to test positive for

illegal substances. Father also tested positive for methadone even though he did not have a valid prescription for this drug.

MCDCS eventually filed a petition seeking the involuntary termination of Mother's parental rights to R.P. in August 2011. A two-day evidentiary hearing on the termination petition was later held in October of 2011. During the termination hearing, MCDCS presented substantial evidence establishing Mother had failed to overcome her addiction to methadone. In addition, it was the general consensus of case workers and service providers that Mother remained incapable of providing R.P. with a safe and stable home environment. The evidence further revealed that Mother's visitation time with R.P. was never increased to unsupervised visits, and in-home visits had been discontinued due to the service providers' concerns regarding Mother's drug use and lack of insight as to how her drug use negatively impacted R.P. Service providers also remained concerned as to Mother's continuing relationship with Father due to Father's disengagement from reunification services, substantial history of criminal activities, and unresolved substance abuse issues. As for the child, MCDCS presented evidence showing R.P. was happy and thriving in a pre-adoptive foster home with the only family the child had ever known.

At the conclusion of the termination hearing, the juvenile court took the matter under advisement. In January 2012, the court entered its judgment terminating Mother's parental rights to R.P. Mother now appeals.

**Discussion and Decision**

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. <u>Bester v. Lake Cnty. Office of Family</u>

& Children, 839 N.E.2d 143, 147 (Ind. 2005). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. When, as here, the juvenile court makes specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. In deference to the juvenile court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied; see also Bester, 839 N.E.2d at 147. Thus, if the evidence and inferences support the trial court's decision, we must affirm. Id.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. In re R.H., 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Moreover, a juvenile court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

Before parental rights may be involuntarily terminated in Indiana, the State is required to allege and prove, among other things:

(B)    that one (1) of the following is true:

5

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)). "[I]f the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added). Mother challenges the sufficiency of the evidence supporting the juvenile court's findings as to subsection (b)(2)(B) and (C) of the termination statute cited above. We shall address each argument in turn.

### I. Conditions Remedied/Threat to Well-Being

Indiana Code § 31-35-2-4(b)(2)(B) requires the State to establish, by clear and convincing evidence, only one of the three requirements of subsection (b)(2)(B). Because we find it to be dispositive, we limit our review to Mother's allegations of error pertaining to subsection (b)(2)(B)(i) of Indiana's termination statute, namely, whether MCDCS presented clear and convincing evidence establishing that there is a reasonable probability the conditions leading to the removal and continued placement of R.P. outside Mother's care will not be remedied.

6

Mother argues that the juvenile court erred in finding she could "not provide [R.P.] with a safe and stable environment" in light of her own testimony that she was living in an "appropriate home," had the "support of relatives nearby," and "had a full[-]time job at the time of termination." Appellant's Brief at 17. Mother goes on to assert that there was "no requirement" in the case plan or Parental Participation order that she "cut off contact" with Father. Id. at 20. Mother therefore insists the juvenile court erroneously relied on the evidence of her recent interactions with Father in terminating her parental rights. Mother therefore contends she is entitled to reversal.

In terminating Mother's parental rights to R.P., the juvenile court made several detailed findings regarding Mother's history of deficient parenting, ongoing addiction issues, income instability, and failure to complete and/or benefit from a majority of the court-ordered reunification services. Specifically, the juvenile court acknowledged that Mother failed to "successfully complete[] drug treatment or home[-]based services" offered both in the underlying case and during the previous CHINS cases involving R.P.'s older siblings. Appellant's Appendix at 18. The juvenile court also noted that Mother, "by her own admission," remains "in methadone treatment with Indianapolis Treatment Center because of an opiate addiction" and at the time of the termination hearing had "not yet been weaned off of [methadone] even though [Mother] has been in treatment for 19 months." Id. As for Mother's employment instability, the juvenile court acknowledged that Mother had done some housecleaning and was currently employed at the time of the termination hearing at McDonald's, but the court went on to clarify that Mother had "only had that job or any employment for approximately a month." Id.

7

Several inconsistencies in Mother's testimony regarding the status of her relationship with Father were also observed by the juvenile court in its findings. For example, after taking note of Father's continued drug use and refusal to remain engaged in reunification services, the court found that Mother's "on-again off-again relationship" with Father had been a "concern to MCDCS." Id. at 17. The court went on to find that although Mother reportedly "broke up" with Father in February 2011, Father continued to financially support Mother. Id. Additionally, the juvenile court noted that Father moved back in with Mother in April 2011 "with plans to get married." Id. Although Mother reported that she and Father had again broken-off the relationship, the juvenile court noted in its findings that Mother admitted she had talked with Father several weeks before the termination hearing and that Father's name remained on the lease to her apartment. Id. Based on these and other findings, the juvenile court concluded:

> There is [a] reasonable probability that the conditions that resulted in the removal of [R.P.] or the reasons for [the child's] continued placement outside the home of [Mother], will not be remedied. [Mother] had undergone services in the past CHINS case[s,] as well as the pending CHINS case involving [R.P.,] and has not successfully completed drug treatment or home[-]based services. Service providers were never able to recommend unsupervised visits, let alone returning [R.P.] to [Mother's] care. Given that [Mother] has had a pattern of inconsistency with services, an on-again off-again relationship with [Father,] who is not participating in services, and a history with MCDCS, it is unlikely that the conditions that resulted in the removal of [R.P.] will be remedied.

Id. at 17-18. A thorough review of the record reveals that clear and convincing evidence supports the juvenile court's findings and conclusions detailed above.

During the termination hearing, home-based counselor Lisa Lance informed the juvenile court that she had worked with Mother from December 2010 through June 2011.

8

Lance further reported that, at the time she last worked with Mother, "there was a lot of instability in [Mother's] and [Father's] relationship as far as them being together" and although both parents had indicated that they had discontinued their relationship in February 2011, Father "continued to . . . pay the rent, utilities[,] [and to] support [Mother]." Transcript at 32. Lance further confirmed that the couple began living together again "under the same roof" in April 2011, and to the best of her knowledge Mother and Father "were still together in June of this year [2011]." Id. When asked whether she was ever able to recommend increased visitation time between Mother and R.P., Lance answered in the negative and further explained:

> I didn't see progress. . . . [Mother], um, didn't have financial stability, . . . other than cleaning houses, that would meet her needs as far as paying bills . . . . [A]lso, I just didn't observe that [Mother] had insight into her drug use. . . . She had made statements to me, um that her drug use has never impacted her children and just showed really no insight into her drug use and how that negatively impacted her ability to parent.

Id. at 35. Mother's current home-based therapist, Erin Cullen, likewise testified that she was unable to recommend unsupervised visits for Mother and R.P. "at this moment." Id. at 58. Cullen further testified that Mother had confided to her that she still "loves" Father and is "still having a hard time reconciling that relationship." Id.

MCDCS case manager Kimberly Barlowe-Gay also testified during the termination hearing. Barlowe-Gay confirmed that Mother failed to successfully complete a majority of the court-ordered dispositional goals including substance abuse treatment, sobriety, home-based counseling, and employment stability despite a wealth of services available to her for approximately eighteen months in R.P.'s case. Barlowe-Gay went on

9

to testify that Mother had failed to demonstrate she was capable of "caring for [R.P.'s] basic needs and necessities" and of providing the child with a stable home. Id. at 94.

Guardian ad Litem ("GAL") Andrea Manning-Dudley also recommended termination of Mother's parental rights. In so doing, Manning-Dudley informed the juvenile court that she had served as the GAL for R.P.'s older siblings and had recommended termination of Mother's parental rights in the prior CHINS cases because Mother "just had not been consistent with anything . . . to reunify with [her] children and any of their services." Id. at 110. Regarding R.P.'s case, Manning-Dudley likewise testified that although Mother had made some improvements in the final month or two immediately preceding the termination hearing, Mother nevertheless had failed to successfully complete the majority of the court's dispositional goals despite having approximately eighteen months to do so. Manning-Dudley further elaborated that throughout all three CHINS cases "[t]hings have been very inconsistent and . . . the home-based pieces were not ever completed successfully . . . ." Id. at 115. Finally, clinical supervisor and addictions counselor Carolyn Henry of the Indianapolis Treatment Center testified that although Mother recently had begun a medically supervised withdrawal from her methadone treatment, "it could take another six to twelve months" to complete the process, depending on Mother's "physiology" and "stress factors." Id. at 135.

As noted above, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's *habitual patterns of conduct* to determine the probability of future neglect or deprivation

10

of the child. In re D.D., 804 N.E.2d 258, 266 (Ind. Ct. App. 2004), trans. denied. "[S]imply going through the motions of receiving services alone is not sufficient" to show that conditions have been remedied if the services "do not result in the needed change, or only result in temporary change." In re J.S., 906 N.E.2d 226, 234 (Ind. Ct. App. 2009). Moreover, where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." In re A.H., 832 N.E.2d 563, 570 (Ind. Ct. App. 2005).

After reviewing the record in its entirety, we conclude that clear and convincing evidence supports the juvenile court's specific findings set forth above. These findings, in turn, provide ample evidence to support the court's ultimate decision to terminate Mother's parental rights to R.P. Mother's arguments to the contrary, emphasizing her self-serving testimony and suggesting that the juvenile court improperly relied upon evidence concerning her ongoing relationship with Father, rather than the evidence cited by the juvenile court in its termination order, amount to an impermissible invitation to reweigh the evidence. See In re D.D., 804 N.E.2d at 265. Even assuming, without deciding, that the juvenile court improperly relied on testimony concerning the current status of Mother's and Father's relationship in terminating Mother's parental rights because Mother was never "given notice" that continuation of that relationship might result in termination of her parental rights as Mother suggests, see Appellant's Brief at 20, Mother still does not prevail because the judgment remains sufficiently supported by numerous other findings which substantiate its determination that there is a reasonable probability the reasons for removal and continued placement of R.P. outside Mother's

care will not be remedied.  See, e.g., A.J. v. Marion Cnty Office of Family & Children, 881 N.E.2d 706, 715 (Ind. Ct. App. 2008) (stating that to the extent a judgment is based on erroneous findings, those findings are superfluous and are not fatal to the judgment if the remaining valid findings and conclusions support the judgment), trans. denied. Accordingly, we find no error.

## II. Best Interests

We next consider Mother's assertion that MCDCS failed to prove termination of her parental rights is in R.P.'s best interests.  In determining what is in the best interests of a child, the juvenile court is required to look beyond the factors identified by the Indiana Department of Child Services and look to the totality of the evidence.  McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the child. Id.  The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship.  Id.  Moreover, we have previously held that the recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests.  In re M.M., 733 N.E.2d 6, 13 (Ind. Ct. App. 2000).

In addition to the findings previously cited, the juvenile court made several additional pertinent findings relating to R.P.'s best interests.  Specifically, the juvenile court noted that R.P. "needs permanency" and has lived in a pre-adoptive foster home "his entire life" apart from the first several months the child "spent in the hospital

because of methadone withdrawal." Appellant's Appendix at 19. The court further found that the "pre-adoptive home is safe and stable and all of [R.P.'s] needs are being met." Id. Based on these and other findings, the juvenile court concluded that termination of Mother's parental rights is in R.P.'s best interests. These findings and conclusion, too, are supported by the evidence.

During the termination hearing, GAL Manning-Dudley described R.P.'s interactions with the foster parents as "great" and "loving" with a "natural attachment" and "bond." Transcript at 120. When asked to explain why she believed termination of Mother's parental rights to be in R.P.'s best interests, the GAL replied:

> We have, um, the history with the other two children, we have eighteen months of history with just [R.P.] and trying to get to where we need to be to have reunification, and . . . I have not been able to see anything that would lead me to believe that [Mother] can keep [R.P.] safe and . . . in a drug[-]free environment . . . and being able to parent him. . . . Like I said earlier[,] we're still in supervised visitation.

Id. at 121. Similarly, in recommending termination of Mother's parental rights, case manager Barlowe-Gay reiterated that Mother has not shown she is capable of providing a stable home for R.P. or that she can provide for R.P.'s "basic needs and necessities." Id. at 94. Barlowe-Gay further testified that R.P. was currently placed in a "safe and stable" pre-adoptive foster home where the child was progressing "very well" and living in "the only home that [the child] has known." Id. at 95.

Based on the totality of the evidence, including Mother's unresolved struggle with substance abuse, financial instability, and failure to successfully complete and/or benefit from a wealth of reunification services available to her throughout the underlying proceedings, coupled with the testimony from case manager Barlowe-Gay and GAL

13

Manning-Dudley recommending termination of the parent-child relationship, we conclude that there is sufficient evidence to support the juvenile court's determination that termination of Mother's parental rights is in R.P.'s best interests. See, e.g., In re A.I., 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (testimony of court-appointed advocate and family case manager, coupled with evidence that conditions resulting in continued placement outside home will not be remedied, is sufficient to prove by clear and convincing evidence termination is in child's best interests), trans. denied.

This court will reverse a termination of parental rights "'only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made.'" Matter of A.N.J., 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting Egly v. Blackford Cnty. Dep't of Pub. Welfare, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.

FRIEDLANDER, J., and PYLE, J., concur.